**IN THE COURT OF APPEALS OF IOWA**

No. 21-1034
Filed September 22, 2021

**IN THE INTEREST OF M.M.,**
**Minor Child,**

**A.M., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Scott County, Korie Talkington, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Christine Frederick of Zamora, Taylor & Frederick, Davenport, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General for appellee, State.

Rebecca Sharpe, Bettendorf, attorney and guardian ad litem for minor child.

Considered by Tabor, P.J., and Greer and Badding, JJ.

**GREER, Judge.**

A mother, A.M., appeals from the termination of her parental rights of her child, M.M. A.M. argues the State did not make reasonable efforts to reunite her and M.M. and the termination of her parental rights is not in M.M.'s best interests.

**I. Background Facts and Prior Proceedings.**

M.M. was born in 2017. In May 2018, A.M. was struggling with abuse of prescription drugs and had friends watching M.M. M.M. went back and forth between A.M.'s home and the friends' home while A.M. served jail time and probation. The department of human services (DHS) became involved in 2018 over concerns about A.M.'s drug use and mental health. In January 2019, when A.M. finished her jail sentence, M.M. returned to her care. M.M. was adjudicated a child in need of assistance (CINA) the next month. However, as the year progressed, A.M. was doing well—she had nine months sobriety under her belt and was cooperating with other services and her probation officer.

Unfortunately, A.M. relapsed and began to backslide. She placed M.M. with another family as the situation worsened in 2019.[1] A court order formally removed M.M. from A.M.'s care in August, citing concerns with A.M.'s mental health, substance abuse, and housing stability.

A.M. has not been consistent with her mental-health or substance-abuse treatment since M.M.'s removal. A.M. was dismissed from family wellness court

---

[1] M.M. remained with this family at the time of the termination hearing. This is a pre-adoptive home. A.M. has asked repeatedly for M.M. to be moved to another home with the paternal grandfather of some of her other children. But DNA testing revealed that this man was not the biological grandfather of M.M., and the proposed move would put M.M. much farther away from A.M.

because of nonattendance. In spite of diagnoses of depression, anxiety, obsessive compulsive disorder, and bi-polar disorder, she was not participating in mental-health services. She last took a drug test in May 2020; it came back positive for methamphetamine, cocaine, and amphetamine. Since that time, she has not complied with any of the eleven drug tests requested by DHS, and there are concerns that she may not have been sober for all court proceedings. Her engagement in counseling and medication management halted in 2020. A.M. was inconsistent with providing waivers for DHS to contact her providers. For those they could contact, they received reports of nonattendance.

A.M. quit her job in the months just before the termination hearing and was receiving unemployment as well as income from cleaning two houses at the time of the hearing. A.M. has not found her own stable housing despite efforts to find an apartment. At the time of trial, A.M. lived with a friend and believed the home would be safe for M.M.

At trial, A.M. stated that she had been attending NA and AA meetings one to three times per month, was working with a counselor, had graduated from substance-abuse treatment at two facilities, and had just recently seen a doctor. She also claimed she was taking all of her medications. But none of these claims were corroborated, and no caseworker had heard her discuss these efforts. Before the termination hearing, communication had deteriorated between A.M. and DHS, as well as with A.M. and M.M.'s guardian ad litem. A.M. was no longer responding to emails, texts, and phone calls but claimed she was often not receiving the communications.

What A.M. has done consistently is visit M.M. There is an undisputed bond between mother and child. However, those who observed the visits found that some days were better than others—at times, A.M. was engaged with M.M., while other times she seemed to struggle with staying awake, paying attention, or directing M.M.'s behavior. There were concerns that she was arriving to visits while under the influence of illicit substances. A.M. denied these claims. The month before the hearing, however, A.M. missed five of the twelve offered visitations. M.M.'s foster mother reports that when A.M. did not come or cancelled her visits, M.M. would act out, lose sleep, and appear disappointed.

DHS remained concerned with A.M.'s substance abuse, mental health, housing stability, employment, and parenting skills. A.M. pointed to COVID-19 as a major barrier to her success, claiming it made cooperating with services far tougher. She also alleged she was sabotaged by those assigned to her case. While A.M. had several complaints about the efforts the State had made toward reunification, nothing in the record shows she brought these concerns to the court.

A.M.'s parental rights were terminated under Iowa Code section 232.116(1)(e), (h), (k), and (l) (2020).

## II. Analysis.

A.M. alleges (1) the State did not make reasonable efforts to reunite mother and child, and (2) the termination of her parental rights is not in M.M.'s best interests.

When reviewing a termination of parental rights, there are three steps in our analysis. First, we determine whether the statutory grounds have been established; second, we evaluate if the termination is in the best interest of the

child; and third, we ensure the exceptions in Iowa Code section 232.116(3) do not prevent termination. *See In re D.W.*, 791 N.W.2d 703, 706–07 (Iowa 2010). A.M. has not raised any of the section 232.116(3) exceptions on appeal.

Our review is de novo, and while we are not bound by the juvenile court's findings of fact, we do give them weight, particularly in determining credibility. *Id.* at 706.

**A. Reasonable efforts.**

Reasonable efforts are a prerequisite of a number of possible termination grounds. *See In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) ("[Iowa Code section 232.116(1)(c), (d), (e), (g), and (k)] all contain a common element which implicates the reasonable effort requirement."); *In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (requiring reasonable efforts be proved when terminating under section 232.116(1)(h)). Further, Iowa Code section 232.102(7) requires that the department "shall make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child."

There is no cookie-cutter definition of what constitutes "reasonable efforts"—each case will have unique requirements. *In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002). The overall goal is to improve parenting skills and provide a visitation plan that will both protect the child and lead to reunification. *Id.* Still, to preserve error on the issue, a parent has "a responsibility to object when they claim the nature or extent of services is inadequate." *L.M.*, 904 N.W.2d at 839–40. "In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding." *C.H.*, 652 N.W.2d at 148. "[V]oicing complaints regarding the adequacy of services

to a social worker is not sufficient. A parent must inform the juvenile court of such challenge." *Id.*

On this record, A.M. did not raise her concerns with the services provided in the proper forum. In fact, there are multiple hearings where A.M. explicitly did not request additional services. Even if she discussed her concerns with caseworkers, these conversations would not preserve the issue for our court. So we do not consider this issue further. Because A.M. does not otherwise challenge the statutory grounds for termination, we affirm each of the statutory grounds.

### B. M.M.'s best interests.

A.M. also argues that terminating her parental rights is not in M.M.'s best interests. It is undisputed that M.M. and her mother have a bond. M.M. still calls her "Mom." A.M. has, until recently, been very consistent and determined in maximizing visitation.

That said, while A.M. showed steady progress early on in the State's involvement, the initial concerns have ensnared her once more. A.M. tested positive for methamphetamine, amphetamine, and cocaine in May 2020 and has not tested since, missing eleven drug tests. We can assume missed drug tests would have been positive. *See, e.g.*, *In re D.G.*, No. 20-0587, 2020 WL 4499773, at *4 (Iowa Ct. App. Aug. 5, 2020) ("And he missed some drug testing. We presume those tests, at least the ones he did not miss because of his work schedule, would have resulted in positive tests."); *In re C.W.*, No. 14-1501, 2014 WL 5865351, at *2 (Iowa Ct. App. Nov. 13, 2014) ("She has missed several drug screens, which are thus presumed 'dirty,' i.e., they would have been positive for illegal substances."). A.M. has not shown any sustained effort to improve her

mental health or medicine management. Both the juvenile court and DHS believe that A.M. was not managing her substance abuse or mental health during visits or court proceedings. She does not have stable housing, failed to participate in parenting classes, and walked away from stable employment. Finally, A.M. struggled to take accountability for these challenges or recognize why these are issues for M.M. *See In re L.B.*, No. 17-1439, 2017 WL 6027747, at *2 (Iowa Ct. App. Nov. 22, 2017) ("[The mother] still externalizes blame for her conduct and does not understand why [her child] was removed from the home."). We agree with the juvenile court that termination is in M.M.'s best interests.

## III. Conclusion.

Because A.M. did not bring her concerns with reasonable efforts to the court's attention and because termination is in M.M.'s best interests, we affirm the termination of the mother's parental rights.

**AFFIRMED.**